IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

FRANCES C. MYERS,                          )
                    Plaintiff,             )
                                           )
v.                                         )        CIVIL ACTION NO: 3:15-07762
                                           )
CAROLYN. W. COLVIN,                        )
Acting Commissioner of Social Security,    )
                    Defendant.             )

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social

Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401-433, 1381-1383f. By Orders entered June 18, 2015, and January 5, 2016

(Document Nos. 4 and 14.), this case was referred to the undersigned United States Magistrate

Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and

Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending

before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos.

11 and 12.), and Plaintiff's Reply. (Document No. 13.)

The Plaintiff, Frances C. Myers (hereinafter referred to as "Claimant"), filed applications

for DIB and SSI on January 26, 2012, and April 27, 2012, respectively, alleging disability as of

April 17, 2011, due to bipolar disorder, anxiety disorder, chronic migraines, agoraphobia, panic

attacks, fibromyalgia, carpal tunnel syndrome, acid reflux disorder, cervical disc ruptured,

bulging lumbar discs, chronic pain, high blood pressure, extreme chemical allergies, early

atherosclerotic disease, and fatty liver. (Tr. at 158, 373-79, 391-97, 398, 402.) The claims were

denied initially and upon reconsideration. (Tr. at 158, 213-14, 215-29, 230-44, 245-62, 263-80,

281-82, 288-90, 293-95, 302-04, 306-08, 309-11, 313-15.) On October 30, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 316-18.) A hearing was held on December 18, 2013, before the Honorable Maria Hodges. (Tr. at 179-212.)   By decision dated January 10, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 158-72.) The ALJ's decision became the final decision of the Commissioner on April 21, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-7.) Claimant filed the present action seeking judicial review of the administrative decision on June 17, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2014). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir.

1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2014). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your

functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, April 17, 2011. (Tr. at 160, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "obesity, degenerative disc disease, carpal tunnel syndrome, bipolar disorder, anxiety, and depression," which were severe impairments. (Tr. at 160, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 162, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for light work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] can frequently handle and finger bilaterally; occasionally reach overhead; frequently reach in all other directions; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; should avoid concentrate[d] exposure to cold, wetness, vibration, pulmonary irritants, and hazards; can do simple two to three step work like activities; occasionally interact with others in

5

> low stress work (defined as minimal independent judgment required and only occasional decision-making required).

(Tr. at 164, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 170, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as a clerical worker and laundry worker, at the unskilled, light level of exertion, and as a product inspector and product packager, at the unskilled, sedentary level of exertion. (Tr. at 170-71, Finding No. 10.) On this basis, benefits was denied. (Tr. at 170-71, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on April 3, 1973, and was 40 years old at the time of the administrative hearing on December 18, 2013. (Tr. at 170, 373, 391.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 170, 401, 403.) In the past, she worked as a retail clerk, an office clerk, a customer service worker, and a nail technician. (Tr. at 170, 403.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and will summarize it and discuss it below in relation to Claimant's arguments.

*Physical Impairments*:

On March 18, 2008, an MRI scan of Claimant's cervical spine demonstrated degenerative disc disease at L4-5, without significant herniation. (Tr. at 512-14.) The thoracic spine essentially was normal. (Id.)

Claimant was diagnosed by Matthew C. Wilson, M.D., with bipolar disorder and anxiety, migraine headaches, arthritis, carpal tunnel syndrome ("CTS"), and bone spurs and bulging discs in her neck with spurs in the back, as early as September 16, 2008. (Tr. at 487-89.) The migraine headaches dated back to childhood. (Tr. at 482.)

Claimant complained of headaches and migraine headaches as early as July 14, 2009, prior to her alleged onset date. (Tr. at 481-82.)

An MRI scan of Claimant's cervical spine on March 16, 2010, demonstrated mild disc bulge at C4-5, without significant underlying spinal stenosis; broad based disc osteophyte complex formation at C5-6, with small associated central disc protrusion; and disc herniation at C6-7. (Tr. at 501-02, 510-11.)

On July 13, 2010, it was noted that claimant was prescribed Imitrex for her migraines. (Tr. at 525.) On October 10, 2010, Claimant complained of right hand numbness and pain and lower back pain, and was diagnosed by Dr. Michael W. Gibbs, M.D., with cervical and lumbar disc disease. (Tr. at 520.)

A further MRI scan of Claimant's cervical spine on October 21, 2011, demonstrated slight bulging at C4-C5, mild central annular bulge at C5-6 and C6-C7, and a bulging disc and smaller central subligamentous protrusion, without spinal cord compression or nerve root impingement. (Tr. at 503.) The results suggested progression from the previous exam. (Tr. at 502, 506, 540-41.)

On November 7, 2011, Matthew C. Werthammer, M.D., conducted a neurological consultation at the request of Dr. Michael Gibbs. (Tr. at 499-500.) Claimant complained that she hurt all over and experienced headaches, migraines, and chronic neck and mid and low back pain with intermittent pain into the extremities. (Tr. at 499.) Neurological exam revealed that Claimant was alert and oriented, had intact memory, followed complex commands briskly, had normal extremity strength and muscle tone, intact sensation and deep tendon reflexes, and negative bilateral straight leg raising. (Tr. at 500.) Dr. Werthammer diagnosed mild degenerative spinal disease, with long standing chronic diffuse pain. (Id.) He explained that a specific spinal operation would not have provided her satisfactory relief and suggested referral to a pain specialist, together with exercise, nicotine cessation, and weight loss. (Id.)

An MRI scan of Claimant's lumbar spine on December 23, 2011, revealed disc desiccation and bulging at L4-5, with only slight canal narrowing and minor disc bulging at L5-S1, without any significant canal or neural foraminal narrowing. (Tr. at 507.)

Claimant returned to Jason Southall, PA-C, on January 10, 2010, to re-establish care. (Tr. at 519.) She complained of neck pain and Mr. Southall diagnosed multi-level cervical disc bulge and bipolar disorder. (Id.)

On January 8, 2013, Claimant reported to Jennifer M. Fields, APRN, FNP, that after taking Topamax, her headaches decreased from occurring daily to three to four times a week. (Tr. at 978.) Claimant also reported that the headaches were debilitating and that she was unable to function with them. (Id.) Ms. Fields noted that an October 2012, an MRI of the brain was normal. (Id.) Ms. Fields thought that Claimant would benefit from a more aggressive dose of medication, and therefore, increased the dosage of Topamax. (Tr. at 982.) On March 26, 2013, Claimant reported that the increased Topamax improved her headache symptoms and frequency from three to four times a week to once every seven to ten days. (Tr. at 968.) At that time, Claimant reported continued headache symptoms because she had stopped taking Topamax for two weeks, secondary to bilateral flank pain, possibly related to kidney stones. (Id.) On August 27, 2013, Claimant reported that her primary care physician had ruled out kidney stone issues and that she re-started the Topamax. (Tr. at 936.) She indicated a continued decrease in frequency from three to four times a week to once every seven to ten days. (Id.) On December 3, 2013, Claimant reported that her headaches had worsened due to neck pain. (Tr. at 1153.) Although Claimant asked to consider botox treatment, Ms. Fields explained that she would try other trial oral medications first. (Tr. at 1157.) Ms. Fields prescribed Propranolol. (Id.)

*Mental Impairments*:

On August 12, 2009, Dr. Carol A. Klein, conducted a psychiatric evaluation, at which time she noted that Claimant was working as a medical secretary and had an eight-year history of bipolar disorder and anxiety problems, including social anxiety since kindergarten. (Tr. at

587-89.) Dr. Klein diagnosed bipolar disorder, hypomanic; anxiety disorder NOS; and assessed a GAF of 55. (Tr. at 589.) Claimant underwent treatment with Dr. Klein at Huntington Behavioral Health, and individual therapy with Julie Branham, MSW, LICSW, beginning in August 2009. (Tr. at 629.) On December 8, 2009, Dr. Klein assessed Claimant as manic, and worsening. (Tr. at 624.) Dr. Klein noted on January 26, 2010, Claimant's complaints of migraine headaches and noted that she was more calm and managed everything better. (Tr. at 621.) She assessed that her mania had decreased to a mild level. (Id.)

On May 4, 2010, Ms. Branham acknowledged Claimant's complaints of migraines and noted that she wore "dark glasses." (Tr. at 615.) Dr. Klein noted that Claimant wore sunglasses on May 18, 2010. (Tr. at 614.) She found that Claimant's mood was better and only mildly manic. (Id.) On July 13, 2010, Dr. Klein observed that Claimant's mood was hopeful and that her speech was rapid but non-pressured, mildly slurred but not disorganized. (Tr. at 612.) She assessed Claimant as having been "much more stabile [with] mild hypomanic speech." (Id.) Claimant reported on October 5, 2010, that she was pleased with her headache regimen, which markedly reduced the frequency and severity and that her mood had been more stable. (Tr. at 610.) Dr. Klein observed that Claimant wore sunglasses, exhibited a "pretty good mood" and broad affect, and exhibited rapid, but otherwise normal, speech. (Id.) Dr. Klein opined that Claimant's mood had been "remarkably stable with her improvement in her migraines, despite the financial stressors." (Id.)

On March 29, 2011, Claimant reported increased work stress due to her office manager's Stage 4 brain cancer. (Tr. at 608, 647.) Dr. Klein observed that Claimant continued to wear sunglasses, maintained good eye contact and rapport, exhibited normal psychomotor behavior, normal thought content, was alert and oriented, exhibited good memory and intellectual

functions, had intact insight and judgment, and exhibited rapid, somewhat pressured, and slightly slurred, but coherent speech. (Id.) Dr. Klein assessed that Claimant's mood was very anxious and tense with high level work stress. (Id.)

On July 29, 2011, Claimant reported that she had a total nervous breakdown in April 2011, and quit her job. (Tr. at 606, 645.) Dr. Klein noted that Claimant's mood was "fairly well controlled" with medication. (Tr. at 607, 646.) Claimant presented with a "stressed out mood" and depression on October 20, 2011, resulting from financial concerns. (Tr. at 604, 643.) Dr. Klein noted that Claimant's mood rapidly cycled up and down and that although she responded well to Seroquel, she would do better with a more consistent dose. (Tr. at 605, 644.) On January 11, 2012, Claimant reported daily headaches and variable and weird sleep patterns. (Tr. at 602, 641, 805.) Dr. Klein noted that she had been more manic, with rapid and pressured speech, the prior two days. (Id.) On mental status exam, Claimant presented wearing sunglasses, maintained good eye contact and rapport, exhibited rapid speech, had a stressed and slightly manic mood and fairly broad affect, and exhibited good memory and intellectual functioning, but displayed poor concentration and was distracted easily. (Tr. at 602-03, 641-42, 805-06.) Claimant reported that she was unable to work due to pain and inability to function well after exerting herself getting ready, and as a result of daily headaches. (Tr. at 603.) On April 9, 2012, Claimant expressed frustration over having to change doctors. (Tr. at 600, 639, 803.) Despite her frustration, Dr. Klein noted that her mood was more stable and less manic, with occasional depression when her pain and migraines were more out of control. (Tr. at 600.) Dr. Klein also noted that Claimant had become more anxious and panicky, with increased panic attacks. (Id.) She also did not want to leave the house or have people see her, and was uncomfortable around men. (Id.) On mental status exam, Dr. Klein observed that Claimant wore sunglasses, exhibited

fair eye contact and rapport, had normal psychomotor activity and thought content, was alert and oriented, and had good memory and intact intellectual functions, insight, and judgment. (Tr. at 600, 639, 803.) Claimant's speech was very fast, but organized, more controlled and non-pressured, and comprehendable; and her concentration was "better, more focused." (Tr. at 600-01, 639-40, 803-04.)

On May 16, 2012, Dr. Klein completed a form Routine Abstract Form – Mental, on which she opined the following mental functioning limitations:

> Frustration and irritability with increasing anxiety; panic attacks; social withdrawal and isolation in public or even at home when environment is chaotic; discomfort around unfamiliar men; self-conscious; limited mobility due to back and neck disc problems and pain; concentration is poor [with] difficulty with more detailed instructions and tasks.

(Tr. at 649.) Noting that she last saw Claimant on April 9, 2012, Dr. Klein noted that Claimant was oriented; had an anxious mood and broad affect; exhibited very rapid and rambling speech; had normal perceptions, judgment, psychomotor behavior, and memory; exhibited mildly deficient insight and social functioning; and had moderately deficient concentration, persistence, and pace. (Tr. at 650.) Dr. Klein noted that Claimant's psychiatric illness generally was more stable when she maintained adequate doses of her medication, but that her condition decreased when she was unable to maintain steady medication dosage due to financial hardships. (Tr. at 649.)

On July 10, 2012, Claimant reported increased emotional problems and that she was "about to have a nervous breakdown" due to her medical problems. (Tr. at 802.) Claimant was frustrated with the interference of some medical problems with others, and the medication limitations she faced due to her liver problems. (Id.) Mental status essentially was the same with the exception of occasional fleeting thoughts of suicide. (Tr. at 801.) On October 9, 2012,

Claimant reported that her mood was "awful" and explained an incident at traffic court that caused her to fear that she would not be allowed to drive, and consequently, would lose her children. (Tr. at 798.) Dr. Klein noted that Claimant's speech remained rapid but that Claimant was able to control it when she consciously tried. (Tr. at 799.)

Claimant underwent individual therapy with Richard Reeser, M.A., on December 21, 2012. (Tr. at 849.) Mr. Reeser noted that she wore sunglasses and spoke almost non-stop. (Id.) On January 8, 2013, Dr. Klein noted that Claimant had been working more actively with neurology and the neurosurgeon for her headaches and back pain. (Tr. at 847.) Claimant reported increased anxiety, daily headaches, and little energy or motivation due to the weather. (Id.) She also reported a lot of marital conflict and stress with her children and finances, and that she physically was unable to do a lot of her usual housework. (Id.) Dr. Klein noted that her mood was the same and that she tolerated her medications well. (Id.) On exam, Dr. Klein observed fast speech that occasionally was incoherent, a depressed mood, and a common complaint of others. (Id.)

Claimant continued her individual therapy with Mr. Reeser into 2013. (Tr. at 1029, 1033-34.) On August 9, 2013, Claimant reported to Dr. Klein that her mood had gone "down, down, down," due to her husband having lost his job, which drove her crazy at home, and due to car troubles. (Tr. at 1031, 1162.) Claimant denied suicidal thoughts, but complained of low interest and motivation, decreased grooming and hygiene, weight gain, and denture problems. (Id.) Dr. Klein observed that Claimant exhibited poor eye contact, non-stop but not quite as fast speech, a constricted affect, and some circumstantiality in her stream of thought, that was easily redirected. (Id.) Dr. Klein noted that Claimant attended therapy regularly. (Tr. at 1032, 1163.)

Claimant presented to Prestera Center on August 26, 2013, with her husband, for treatment of exacerbation of bipolar disorder. (Tr. at 1070.) Claimant was manic and her husband reported that she had experienced periods of depressed mood. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in giving little weight to the opinion of her treating psychiatrist, Dr. Klein. (Document No. 11 at 9-11.) Specifically, Claimant first asserts that the ALJ's stated reasons for giving Dr. Klein's opinion little weight, i.e., that it was vague and failed to contain specific limitations, did not constitute "good reasons" as required by the Regulations and rulings. (Id. at 10.) Second, she asserts that the ALJ failed to recognize the factors set forth in 20 C.F.R. 404.1527(d)(2)-(6) and 416.927(d)(2)-(6), including the length of the treatment relationship, the nature and extent of the treatment relationship, and the frequency of examination. (Id.) Finally, Claimant asserts that the ALJ did not consider adequately the entirety of Dr. Klein's medical source statement and failed to identify any contrary evidence. (Id. at 10-11.) Claimant contends that the ALJ mischaracterized Dr. Klein's opinion in that the ALJ focused only on the moderate deficiencies in social functioning, concentration, persistence and pace to the exclusion of the detailed information regarding her mental impairments and resulting limitations. (Id. at 11.) Consequently, Claimant contends that Dr. Klein's opinion was not vague and indicated specifically that Claimant "would need additional limitations in social functioning, including but not limited to restrictions on working with the public and male coworkers and supervisors." (Id.) Furthermore, it was reasonable to conclude that Claimant also "would have significant issues with task completion and attendance as a result of her psychological impairments." (Id.)

14

In response, the Commissioner asserts that the ALJ properly determined that Dr. Klein's opinion merited only little weight under the Regulations. (Document No. 12 at 11-15.) The Commissioner first asserts that the determination of disability is a legal determination expressly reserved to the Commissioner, not a medical source. (Id. at 11.) Second, the Commissioner contends that the ALJ followed the Regulations in that after deciding not to accord Dr. Klein's opinion controlling weight, she considered the factors set forth in the Regulations. (Id. at 12.) Third, the Commissioner asserts that the ALJ accounted for Dr. Klein's assessed limitations that were credibly established by the evidence of record and properly found that her greater limitations were inconsistent with and unsupported by the objective evidence of record. (Id. at 12-13.) The Commissioner also contends that the ALJ accommodated many of Dr. Klein's limitations when she limited Claimant to work that involved only simple two to three step work like activities and involved only occasional interactions with others in a low stress environment, with minimal independent judgment and only occasional decision-making. (Id. at 13.)

The Commissioner further contends that the ALJ properly gave little weight to Dr. Klein's opinion because it conflicted with her treatment records, conflicted with the conclusions of the State agency physicians' opinions, and undermined the persuasive records from Prestera. (Id.)

Regarding the inconsistency between Dr. Klein's opinion and treatment notes, the Commissioner notes that in May 2012, Dr. Klein opined that she had poor concentration but yet one month prior noted that her concentration was "better, more focused." (Id. at 14.) Also, the Commissioner notes that Dr. Klein noted one month after his opinion that Claimant's increased frustration and anxiety was due to changing doctors. (Id.) The Commissioner asserts that Dr. Klein failed to address certain work limitations, which were considered by the State agency

physicians. (Id.) Finally, the Commissioner asserts that the treatment records from Prestera demonstrated improvement with therapy programs. (Id. at 15.)

In reply, Claimant acknowledges the Commissioner's asserted reasons that the ALJ discounted Dr. Klein's opinion, but asserts that none of the articulated reasons actually were stated by the ALJ in her decision. (Document No. 13 at 1.) Thus, Claimant asserts that the Commissioner's response is "nothing more than *post hoc* rationale as the ALJ herself did not provide such reasons or explanation in support of her own finding." (Id. at 2.) Accepting the Commissioner's arguments however, Claimant asserts that the ALJ neither referenced any evidence she considered in assigning little weight to Dr. Klein's opinion, nor considered the requisite regulatory factors. (Id. at 3.) Claimant therefore asserts that the ALJ erred in failing to provide good reasons for discounting Dr. Klein's opinion. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing her RFC. (Document No. 11 at 12-16.) In particular, Claimant asserts that the ALJ failed to address properly conflicting evidence and based her RFC, in part, on her erroneous characterization of the evidence. (Id. at 13.) Regarding the limitations resulting from her mental impairments, Claimant contends that the ALJ ignored statements from several medical providers, including Jason Southall, Ashley Clay, Dr. Werthammer, and Jennifer Fields. (Id. at 14.) Despite the ALJ having assessed moderate limitations in the ability to maintain social functioning, concentration, persistence, or pace, Claimant asserts that the ALJ failed to provide little corresponding limitations. (Id. at 15.) Regarding her physical impairments, Claimant asserts that the ALJ erred in finding that she failed to follow up with her physician regarding her left CTS, when the record demonstrated treatment from Marshall Health and new evidence to the Appeals Council revealed her intent to have left CTS release. (Id.) Claimant

16

asserts that the ALJ also failed to acknowledge her use of a prescribed cane for ambulation and the lack of functional improvement in her right hand despite CTS release. (Id.) Finally, Claimant asserts that although the ALJ acknowledged her migraine headaches every seven to 10 days, she failed to recognize the evidence of daily headache symptoms or consider the effect of three to four monthly migraine headaches. (Id. at 15-16.)

In response, the Commissioner asserts that the ALJ properly captured all of Claimant's credibly established limitations in her RFC finding and that the ALJ properly assessed Claimant's mental and physical RFC. (Document No. 12 at 16-20.) Respecting Claimant's mental RFC, the Commissioner asserts that Claimant's argument that the ALJ failed to address properly all conflicting evidence is misleading. (Id. at 16.) Specifically, Claimant fails to note that the ALJ described her treatment with Prestera as a partial hospitalization program and noted that she attended daily group therapy. (Id. at 16-17.) Contrary to Claimant's assertion, the ALJ also acknowledged that Claimant routinely wore sunglasses and considered evidence of pressured speech and racing thoughts. (Id. at 17.) The Commissioner contends that Jason Southall was not an acceptable medical source and that Dr. Caraway was not a medical professional engaged to treat her mental impairments. (Id.) The Commissioner further asserts that remand is not warranted under Mascio, because the ALJ thoroughly discussed all relevant evidence and adequately addressed her functional limitations pursuant to SSR 96-8p. (Id. at 18.) Moreover, the ALJ provided sufficient explanation for her decision to allow judicial review. (Id. at 18-19.)

Respecting her physical impairments, the Commissioner asserts that contrary to Claimant's assertion, the ALJ specifically noted that Dr. Ozturk prescribed a cane and noted in three places in her opinion that Claimant used the cane to help her walk. (Id. at 19.) Furthermore,

the ALJ noted Claimant's diagnosis of bilateral CTS, her treatment of the condition, and acknowledged Claimant's alleged limitations. (Id.) Nevertheless, the evidence demonstrated significant improvement following the right CTS release. (Id.) The ALJ therefore, assessed manipulative limitations and gave reduced weight to the State agency physician who failed to assign such limitations. (Id.) Furthermore, Claimant reported that her left hand surgery improved numbness and tingling. (Id.) Regarding migraine headaches, the Commissioner asserts that the ALJ found that they were controlled adequately by medication and that that an MRI of the brain was normal. (Id. at 20.) Consequently, the Commissioner contends that the ALJ properly provided evidentiary support for her RFC assessment and that her assessment complied with the applicable rules and Regulations. (Id.)

Claimant asserts in reply that although the ALJ noted that her treatment at Prestera was a partial hospitalization program and that she wore sunglasses, such reference was made in the summary of Claimant's testimony and not in the analysis of the evidence within her RFC assessment. (Document No. 13 at 4.) She asserts that the ALJ's summary of her testimony and finding that she was less than entirely credible does not supplant the ALJ's duty to evaluate the medical evidence. (Id.) The summary does not identify which portions of Claimant's testimony the ALJ considered when assessing her RFC. (Id.) Furthermore, Claimant asserts that the credibility assessment differs from the RFC assessment. (Tr. at 4-5.) Regarding statements Claimant made to various medical providers, Claimant asserts that the Commissioner wants the "Court to ignore evidence from January 2012 and July 2012 that documented [her] interactions with medical providers that were reflective of her uncontrolled bipolar disorder and supported limitations opined by Dr. Klein." (Tr. at 5.) Finally, regarding Mascio, Claimant asserts that the Commissioner provided *post hoc* rationale in an attempt to fit the ALJ's decision into the

Commissioner's narrative. (Id.)

Analysis.

   1. <u>Treating Opinion</u>.

     Claimant alleges that the ALJ erred in giving little weight to the opinion of her treating psychiatrist, Dr. Klein. (Document No. 11 at 9-11.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2014). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2) and 416.927(d)(2).

     Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a

treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2014). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2014). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2014). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2014). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In her decision, the ALJ summarized Dr. Klein's opinion of moderate deficiencies in

social functioning, concentration, persistence, and pace, but noted that Claimant's symptoms were stable with medication and therapy. (Tr. at 169.) The ALJ also noted that Claimant was unable to afford her medication and therapy. (Id.) The ALJ therefore, gave little weight to Dr. Klein's opinion because it was vague and did not contain specific limitations. (Id.) The undersigned finds that the ALJ provided adequate reasons for giving little weight to Dr. Klein's opinion and followed the Regulations and rulings in evaluating Dr. Klein's opinion.

The undersigned notes that although the ALJ gave little weight to Dr. Klein's opinion, she nevertheless assessed moderate limitations in maintaining concentration, persistence, or pace. (Tr. at 163.) Although Dr. Klein assessed mild limitations in social functioning, the ALJ assessed moderate difficulties. (Id.) The ALJ acknowledged that Dr. Klein was Claimant's treating psychologist and summarized the treatment records. The ALJ's summary reveals that Claimant's mental conditions responded to treatment and that for the most part, her mental evaluations essentially were normal. Dr. Klein noted in April 2012, that Claimant's concentration was more focused. Furthermore, as the ALJ noted, the records indicated that Claimant's condition improved when in therapy. (Tr. at 168.) Claimant made steady progress and did better with therapy. At the time of Dr. Klein's opinion, as the ALJ found, the substantial evidence did not support the more restrictive limitations regarding frustration and irritability, panic attacks, and social withdrawal. Nevertheless, the ALJ limited Claimant only to occasional interaction with others and low stress work. Accordingly, the undersigned finds that the ALJ's decision to give little weight to Dr. Klein's opinion is supported by the substantial evidence of record.

21

2.  <u>RFC Assessment</u>.

Claimant also alleges that the ALJ erred in assessing her RFC. (Document No. 11 at 12-16.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 1996 WL 374184, *1 (July 2, 1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." <u>Id.</u> at *5. The Ruling requires that the ALJ conduct a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." <u>Id.</u> at *3. This function-by-function analysis enables the ALJ to determine whether a claimant is capable of performing past relevant work, the appropriate exertional level for the claimant, and whether the claimant is "capable of doing the full range of work contemplated by the exertional level." <u>Id.</u> Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2014). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." <u>Id.</u> at *7.

The ALJ also must "explain how any material inconsistencies or ambiguities, in the evidence in the case record were considered and resolved." Id.

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a per se rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested." Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); see also, Ashby v. Colvin, Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

In the instant case, the ALJ found that Claimant was capable of performing light exertional level work with occasional reaching overhead, as well as postural, environmental, and mental limitations. (Tr. at 164.) Claimant asserts that the ALJ ignored statements from Jason Southall, Ashley Clay, Dr. Werthammer, and Jennifer Fields. (Document No. 11 at 14.)

Regarding Claimant's mental limitations, the undersigned finds that the ALJ adequately considered all the evidence of record. Though Claimant takes issue with the ALJ's characterization of a 12-week partial hospitalization program as group therapy, the fact remained that the ALJ acknowledged the treatment and Claimant's positive response thereto. Furthermore, the ALJ acknowledged that Claimant routinely wore sunglasses and had pressured speech and racing thoughts. (Tr. at 161, 168.) Pursuant to 20 C.F.R. §§ 404.1513(a) and 416.913(a), P.A. Jason Southall was not an acceptable medical source. As the Commissioner notes, P.A. Southall and Dr. Caraway were not related directly in Claimant's mental health treatment. Rather, P.A. Southall was consulted regarding blood pressure medication and Dr. Caraway addressed her physical pain. Despite their observations, as discussed above, the treatment records from Prestera demonstrated an overall improvement in Claimant's mental condition with treatment. Finally, the undersigned finds that the ALJ provided a detailed narrative of her mental RFC assessment, and therefore, that the assessment was made in accordance with the Regulations and pursuant to the Mascio decision.

Regarding Claimant's physical RFC, the undersigned finds that the ALJ specifically acknowledged Claimant's use of a prescribed cane, which she used to help her walk. (Tr. at 165, 167, 169.) The ALJ also acknowledged Claimant's diagnosis of bilateral CTS and found it to be a severe impairment at step two of the sequential process. (Tr. at 160-61.) The ALJ noted that she had constant numbness and tingling in her right thumb and left hand weakness. (Tr. at 165.) She further acknowledged that Claimant dropped objects, was unable to grasp small objects, and had difficulty writing more than five to 10 minutes. (Tr. at 165-66.) Nevertheless, Claimant's condition improved following surgery on her right hand. (Tr. at 167.) Claimant reported

24

increased sensation and 100 percent improvement in the numbness and tingling following surgery. (Id.) Despite reports of numbness and tingling in the left hand, Claimant failed to follow-up on such complaints. (Id.) Despite such improvement, the ALJ found that Claimant could handle and finger bilaterally on a frequent basis, occasionally reach overhead, and frequently reach in all directions. (Tr. at 164.) The ALJ's assessment was consistent with the State agency physicians' opinions.

Finally, the undersigned notes that the ALJ also acknowledged Claimant's reports of migraines. (Tr. at 161.) At step two of the sequential analysis, the ALJ noted Claimant's complaints of daily headaches, which resulted in her inability to get out of bed two to four days a week. (Tr. at 161, 201, 203.) Claimant testified that she managed her headaches with medication and ice packs over her eyes. (Id.) She specifically indicated to her doctor that Topamax decreased her pain and the frequency of her headaches from occurring three to four times a week to once every seven to ten days. (Tr. at 161, 205, 968.) Although the ALJ determined that Claimant's migraines did not constitute a severe impairment, the undersigned finds that she failed to consider fully the limitations resulting therefrom in assessing her RFC. The VE testified, upon questioning by counsel, that if Claimant missed three to four days of work each month, due to any combination of impairments, including her migraines, that employment could not be sustained. There is no indication in her credibility assessment that the ALJ discounted Claimant's reports of inability to get out of bed due to her migraines. Accordingly, the undersigned finds that the ALJ's RFC assessment fails to consider fully the limitations resulting from Claimant's migraines and ignores the testimony of the VE.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District

Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of Claimant's RFC, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge

Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: June 3, 2016.

Omar J. Aboulhosn
United States Magistrate Judge